**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JAMES SEAMON MURPHY,**

  **Plaintiff,**

**vs.**            **CIVIL ACTION NO. 2:18-CV-00688**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

  **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

  This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered May 2, 2018 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 15, 16)

  Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (ECF No. 15), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 16); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from the Court's docket for the reasons stated *infra*.

<u>**Procedural History**</u>

The Plaintiff, James Seamon Murphy, (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on July 21, 2014, alleging disability since May 31, 2014, because of "depression, panic disorder, anxiety."[1] (Tr. at 149-151, 152-153) His claim was initially denied on February 12, 2015 (Tr. at 78-88) and again upon reconsideration on April 22, 2015. (Tr. at 90-92) Thereafter, Claimant filed a written request for hearing on May 21, 2015. (Tr. at 93-94)

An administrative hearing was held on April 11, 2017 before the Honorable Valerie A. Bawolek, Administrative Law Judge ("ALJ"). (Tr. at 29-45) On May 25, 2017, the ALJ entered an unfavorable decision. (Tr. at 12-28) On June 19, 2017, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 148, 238-239) The ALJ's decision became the final decision of the Commissioner on February 28, 2018 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On April 27, 2018, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (ECF No. 15), and in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 16) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

---

[1] In his Disability Report – Appeal, submitted on March 20, 2015, Claimant alleged that he experienced "[i]ncreased anxiety, panic attacks, dizziness, shortness of breath, edema, incontinence, constipation, hearing loss, and weight gain. Lower back pain. Radiating pain and decreased range of motion." (Tr. at 186) He also alleged "[f]atigue, sleeplessness, irritability, isolation, problems concentrating, increased restroom breaks, and increased need to lie down. Increased difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, and climbing stairs. Uses a shower chair." (Id.) Claimant asserted that these symptoms increased, including the radiating lower back pain, numbness and decreased range of motion in his Disability Report – Appeal submitted on May 26, 2015. (Tr. at 203)

Claimant was 56 years old as of the alleged onset date and considered a "person of advanced age" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(e). (Tr. at 152-153) Claimant has a high school education and had worked as a truck driver for several years prior to the alleged onset date, however, after his claim for disability benefits were denied at the initial and reconsideration levels of review, he returned to work as a truck driver but ultimately had to quit because he was not allowed to take his prescribed anxiety medication and maintain employment as a truck driver. (Tr. at 32-33)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

3

work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

4

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision

must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2017. (Tr. at 17, Finding No. 1) Next, the ALJ determined that Claimant had engaged in substantial gainful activity since the alleged onset date of May 31, 2014 during October 2015 to December 13, 2016. (Id., Finding No. 2) However, the ALJ found that there had been a continuous 12-month period during which Claimant had not engaged in substantial gainful activity. (Id., Finding No. 3) At the second inquiry, the ALJ found that Claimant had the following severe impairments: depression; anxiety; and lumbago. (Tr. at 18, Finding No. 4) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 5) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform medium work "except he can tolerate infrequent contact with supervisors and co-workers. He should not be required to deal with the public." (Tr. at 20, Finding No. 6) At step four, the ALJ found Claimant was capable of performing his past relevant work as a truck driver/owner operator. (Tr. at 23, Finding No. 7) Finally, the ALJ determined Claimant had not been under a disability from May 31, 2014 through the date of the decision. (Tr. at 24, Finding No. 8)

**Claimant's Challenges to the Commissioner's Decision**

In his first assignment of error, Claimant states that the ALJ failed to do a proper assessment pursuant to Social Security Ruling ("SSR") 82-62 as to whether he was capable of performing the duties of his past relevant work as a truck driver/owner operator because the ALJ

did not review the mental or physical demands of this work. (ECF No. 15 at 5-7) Moreover, in addition to having no information concerning the mental or physical demands of this work, there was no testimony from the vocational expert concerning whether Claimant could perform his past relevant work, however, the ALJ expressly based her step four finding on this non-existent testimony. (Id. at 7-8) Claimant asserts that the ALJ's failure to make any specific findings of fact regarding the functional demands of his past relevant work and without any further explanation of her step four finding precludes meaningful review. (Id. at 8-9)

Next, Claimant asserts that the ALJ failed to properly assess his obesity in each step of the sequential analysis as required per SSR 02-1p. (Id. at 9) Despite the ALJ's acknowledgement at step two that Claimant's body mass index ("BMI") of 41.1 kg/m2, which is categorized as "extreme", she nevertheless did not meaningfully discuss this impairment beyond that, and compounded this error by failing to give proper credit to the opinion by State agency medical consultant, Dr. Rabah Boukhemis, who considered all of Claimant's physical impairments, including obesity, opining that Claimant would be limited to light work. (Id. at 10-11)

Finally, Claimant states that the ALJ failed to assess his RFC properly because the ALJ did not explain why she discredited Dr. Boukhemis's opinion that Claimant would be limited to light work in contravention to SSR 96-8p. (Id. at 12-13) The ALJ noted that Dr. Boukhemis found only Claimant's degenerative disc disease to be a severe physical impairment, which suggests that she disregarded the nonsevere impairments in her RFC assessment, which is contrary to the Regulations and pertinent Ruling. (Id. at 14) Further, the ALJ did not consider Claimant's description of his working conditions when he made two unsuccessful attempts to work in 2015 and 2016. (Id.) Because the ALJ failed to explain her rationale for the RFC, which should have

included why Claimant's severe and nonsevere impairments do not rise to the functional limitations set forth therein, precludes this Court from conducting a meaningful review of the decision denying benefits. (Id. at 14-15)

Claimant contends that substantial evidence does not support the ALJ's decision and asks the Court to remand this matter to correct these errors. (Id. at 15)

In response, the Commissioner argues that substantial evidence supported the ALJ's finding that Claimant could perform his past relevant work and points to the fact that he performed this work at substantial gainful activity levels for 15 months during the relevant period, from October 2015 through December 2016. (ECF No. 16 at 15) There is no requirement that the ALJ was to obtain the testimony of a vocational expert in determining whether Claimant could perform his past relevant work. (Id. at 15-16) Further, the ALJ was not required to elicit vocational expert testimony to make a finding as to how the truck driver job is actually performed as that determination is within her discretion. (Id. at 16) Claimant himself described his past relevant work as requiring the ability to read and write and drive an 18-wheeler truck, an activity he had performed at substantial gainful levels from October 2015 through December 2016. (Id.)

The Commissioner asserts that Claimant testified that in addition to his physical impairments that have persisted for many years, he also suffered from mental impairments since age 21; the pertinent law provides that when a claimant did past relevant work with the same impairments, as a matter of law, that claimant cannot be found disabled. (Id. at 17) Claimant went back to work as a truck driver in October 2015 and has not shown that his condition deteriorated significantly since he quit working in December 2016. (Id.) The Commissioner points out that SSR 82-62 provides for reasonable inferences can be drawn with respect to the pertinent medical and

nonmedical factors that a claimant can meet the physical and mental demands of past relevant work – since Claimant returned to his past relevant work despite his impairments, the ALJ could reasonably infer that he remained capable of performing that job. (Id.)

With regard to Claimant's obesity, the Commissioner states that the record shows that he was obese before he returned to work as a truck driver and remained obese after he stopped working. There is nothing else in the record that indicated Claimant's obesity caused any further functional limitations or in combination with his other impairments that prevented him from working as a truck driver. (Id. at 18-19)

Contrary to Claimant's argument, the ALJ did not reject Dr. Boukhemis's opinion outright, but did give it some weight; the Commissioner notes that this opinion, finding Claimant capable of a limited range of light work, was provided to the Agency prior to Claimant's return to his past relevant work, which the vocational expert characterized as medium work. (Id. at 19) Therefore, the ALJ's evaluation of Dr. Boukhemis's opinion is supported by substantial evidence. (Id.)

Because the ALJ's decision is based on substantial evidence, the Commissioner asks this Court to affirm the final decision. (Id. at 20)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

<u>Medical Evidence Prior to Claimant's Return to Work, May 2014 through September 2015:</u>

Prior to the alleged onset date of May 31, 2014, Claimant was diagnosed with anxiety, depression, hyperlipidemia, and Vitamin D deficiency in January 2013, July 2013, and January

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

2014; and hyperlipidemia, anxiety disorder, and depression in April 2014. (Tr. at 278, 281, 284, 287) In June 2014, after the alleged onset date, Claimant was diagnosed with hyperlipidemia, depression, and anxiety disorder. (Tr. at 288)

On August 18, 2014, Rachel Stover, FNP, a family nurse practitioner and Claimant's primary care provider, saw him for complaints of back pain and anxiety. (Tr. at 290) Claimant reported that he was applying for disability and claimed that his anxiety was not under control. (Id.) He also complained of bilateral knee pain and low back pain. (Id.) Examination of the lumbosacral spine revealed tenderness on palpation, paraspinal muscle spasms, and lumbosacral spine pain elicited by motion. (Tr. at 290-291) The examination also revealed that Claimant did not have full range of motion of the lumbosacral spine. (Tr. at 291) Examination of the knees revealed crepitus, pain elicited by motion, tenderness on ambulation, full range of motion, and no muscle weakness. (Id.) Diagnoses included hyperlipidemia, arthralgia of the right knee/patella/tibia/fibula, arthralgia of the left knee/patella/tibia/fibula, lumbago, depression, and anxiety disorder, not otherwise specified (NOS). (Id.) X-rays taken on September 22, 2014 indicated the left and right knee were normal. (Tr. at 240-241) A September 22, 2014 computed radiography study of the lumbar spine revealed very minimal rotary curvature of the upper lumbar spine that could be from minimal scoliosis, and degenerative disc disease at the L3-L4 level. (Tr. at 242)

On October 13, 2014, Ms. Stover saw Claimant for complaints of knee joint pain. (Tr. at 296) The diagnoses remained unchanged from the August 2014 visit. (Tr. at 291, 297)

On October 24, 2014, Joshua Matthew Hopkins, PA-C, saw Claimant for complaints of chronic back pain, with a reported pain level of 9/10, that worsened with walking and standing and

radiated into the right lower limb. (Tr. at 299)

On January 14, 2015, Ms. Stover saw Claimant for medication refills (Tr. at 349) He requested an increase in his pain medication. (Id.) Examination of the lumbosacral spine revealed tenderness on palpation, and paraspinal muscle spasms bilaterally. (Tr. at 350) Diagnoses included edema, dysphagia (difficulty swallowing), hyperlipidemia, vitamin D deficiency, lumbago, and anxiety disorder, NOS. (Id.)

On February 11, 2015, Ms. Stover saw Claimant for complaints of anxiety and lower back pain. (Tr. at 352) Diagnoses remained unchanged from the January visit. (Tr. at 350, 353)

On April 29, 2015, Ms. Stover saw Claimant for medication refills, at which time he requested a shower chair because his mother and his lawyer told him to get one for his social security claim. (Tr. at 367) He claimed that he could not stand long enough to take a shower. (Id.) A musculoskeletal examination revealed overall findings of left shoulder tenderness with palpation, decreased range of motion, and decreased strength. (Tr. at 368) Examination of the cervical spine revealed no abnormalities. (Id.) Examination of the lumbosacral spine revealed tenderness on palpation, and paraspinal muscle spasms bilaterally. (Id.) Diagnoses included edema, dysphagia, hyperlipidemia, vitamin D deficiency, left shoulder strain, lumbago, and anxiety disorder, NOS. (Id.)

On May 15, 2015, Ms. Stover saw Claimant to discuss a change in medication. (Tr. at 365) Ms. Stover noted that there had been no recent change in his medical history. (Id.) Ms. Stover prescribed Klonopin for anxiety and referred Claimant to a psychologist. (Tr. at 366)

On June 15, 2015, Claimant presented in the emergency room with complaints of left flank pain that began that morning. (Tr. at 265) He denied similar symptoms in the past. (Id.) He also

complained of lower back pain that he described as chronic. (Id.) A physical examination revealed 5/5 motor strength in all extremities, grossly intact sensation, and normal gait. (Tr. at 266) Range of motion of the back was painful, and straight leg raises produced pain bilaterally. (Id.) A June 15, 2015 x-ray of the abdomen/chest revealed scoliosis but no acute findings. (Tr. at 274) Claimant was discharged home later that day in stable condition, with a diagnosis of back pain. (Tr. at 267) Upon discharge, Claimant was described as having "no functional deficits." (Tr. at 271)

On June 18, 2015, Ms. Stover saw Claimant to discuss his medications and a recent visit to the emergency room for what he described as anxiety. (Tr. at 363) He reported that he was having panic attacks; Ms. Stover prescribed Klonopin for anxiety, and propanolol for essential hypertension. (Id.)

On July 1, 2015, Ms. Stover saw Claimant for complaints of continued left side pain. (Tr. at 361) Diagnoses included essential hypertension, flank pain, and anxiety disorder, NOS. (Tr. at 362)

A July 20, 2015 x-ray of the left shoulder revealed no acute findings. (Tr. at 260) A July 20, 2015 ultrasound of the kidneys was negative. (Tr. at 261)

On July 29, 2015, Ms. Stover saw Claimant for medication refills. (Tr. at 357) Diagnoses included essential hypertension, mastodynia (breast pain), and anxiety disorder, NOS. (Id.)

On August 13, 2015, Ms. Stover saw Claimant for medication refills. (Tr. at 354) Diagnoses remained unchanged from the July 29, 2015 visit. (Tr. at 355, 357)

On September 9, 2015, Ms. Stover saw Claimant for medication refills. (Tr. at 383) Diagnoses included essential hypertension, and anxiety disorder, NOS. (Id.) Ms. Stover prescribed Klonopin for anxiety. (Id.)

Opinion Evidence:

On January 1, 2015, Rosemary L. Smith, Psy.D. completed a Psychiatric Review Technique form. (Tr. at 51-52) Dr. Smith found that Claimant had affective, anxiety-related, and somatoform disorders that did not manifest at listing level severity as they resulted in mild restriction of activities of daily living; marked difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. (Tr. at 51) Dr. Smith performed a mental residual functional capacity assessment based on her review of the record. (Tr. at 55) Dr. Smith found that Claimant had the mental residual functional capacity to perform a variety of work-like activities in situations that involved minimal contact with others. (Id.) On April 7, 2015, Frank Roman, Ed.D. reviewed the updated record and affirmed Dr. Smith's Psychiatric Review Technique form and mental residual functional capacity assessment as written. (Tr. at 66, 70)

On January 15, 2015, Nicole M. Smith, M.A. performed a consultative psychological evaluation for the Disability Determination Service. (Tr. at 247-253) Claimant reported that he lived with his wife and had physical and legal custody of two minor nephews who lived with them. (Tr. at 247) Ms. Smith observed that Claimant's posture was slumped and his gait slow but unassisted. (Id.) Claimant presented with a West Virginia commercial driver's license (CDL) card as proof of identification. (Id.) Claimant reported that he was applying for disability benefits because of the anxiety and depression that he had been fighting since he was 21 years old. (Tr. at 248)

He stated that he had trouble with his back at L3-L4, degenerative disc disease, and mild scoliosis. (Id.) He claimed that his pain was about a "9" every day, and that he could be on his feet

for about 3 to 5 minutes before having to sit down, could not go in stores or be around a lot of people, had panic attacks for the last "couple of years" that had gotten worse, and worried a lot about his situation. (Id.) He claimed that his anxiety medication made it illegal for him to drive a truck, which was what he did, and that he could not function without his anxiety medication. (Id.)

He reported that he was the owner/operator of his own business, and tried to work on an associate's degree in business but could not pass any of his classes because he could not concentrate. (Id.) He later stated that he attempted to complete an associate's degree in business online and lacked 15 credit hours that he needed to graduate. (Tr. at 250) Claimant also reported that he had a nervous breakdown when he was 21 years old, had suicidal thoughts, and missed a lot of work. (Tr. at 248) He stated that he had recent suicidal thoughts with no plan. (Id.) Specifically, Claimant cited depression, anxiety, chronic pain, and functional limitations related to chronic pain as the primary reasons why he was unable to maintain employment. (Id.) He stated that he was last employed in May 2014 as an over-the-road truck driver, and was the owner operator of his own business and drove for US Xpress Incorporated. (Id.) He was required to read and write for his past employment and operate an 18-wheeler truck. (Tr. at 250)

Claimant's presenting symptoms included a long history of recurrent major depressive episodes with intervals of at least two consecutive months in which his mood was relatively normal. (Tr. at 248) He reported persistently depressed mood every day for at least the past several weeks associated with loss of interest in activities, unsatisfying sleep, helplessness, failure, guilt, suicidal thoughts with no plan or intent, agitation, decreased libido, fatigue, frustration, irritability, and difficulty concentrating. (Id.) Ms. Smith noted that chronic pain was a prominent focus of clinical attention during the evaluation, and that Claimant reported disruptions in social,

occupational, and other areas of functioning due to chronic pain. (Id.) He described sadness, worry, and anxiety and appeared frustrated with his inability to work and perform other activities. (Id.) Claimant also reported a history of recurrent and unexpected panic attacks and fear of additional attacks that he associated with heart palpitations, difficulty breathing, fear of dying, sweating, and trembling. (Tr. at 249) He reported that he experienced excessive anxiety in places from which it might be difficult to escape if he were to have a panic attack, and that his agoraphobia fears typically involved places outside of the home such as being in a store or any type of crowd. (Id.) Claimant reported that he was currently receiving outpatient psychotropic medication management from his primary care provider, Rachel Stover, PA-C. (Id.) He also reported that he had been on various antidepressants and anti-anxiety medications throughout his adulthood. (Id.) He reported no history of inpatient mental health treatment. (Id.)

A mental status examination revealed that Claimant's speech was clear and coherent. (Tr. at 251) He was oriented to time, place person, and date; his mood was remarkable for depression and anxiety; his affect was blunted; his thought processes were clear and connected; there was no evidence of delusions, paranoia, obsessive thoughts, or compulsive behaviors; there was no evidence of unusual perceptual experiences; his judgment was moderately impaired based on his response to comprehension questions; his insight was fair based on his responses to questions regarding social awareness; there was evidence of mild psychomotor agitation and pain behaviors; he denied suicidal or homicidal ideation; his immediate memory was normal; his recent memory was moderately impaired; his remote memory was normal; his concentration was mildly impaired; his persistence was mildly deficient; and his pace was variable. (Id.) Social functioning during the evaluation was moderately to severely impaired based on clinical observations of social

interactions with the examiner and others. (Id.) Claimant reported that he did not attend church or other social activities. (Tr. at 252) He also reported that he maintained a checking account, paid bills online, and managed his own finances when he had income. (Tr. at 253) He stated that he did not help with household chores due to chronic pain. (Id.)

Diagnoses included major depressive disorder, recurrent, moderate; somatic symptom disorder with predominant pain, persistent, severe; panic disorder; agoraphobia; and generalized anxiety disorder. (Tr. at 252) Ms. Smith opined that Claimant's prognosis was "poor." (Tr. at 253)

On April 8, 2015, Rabah Boukhemis, M.D. performed a physical residual functional capacity assessment based on his review of the record and opined that Claimant could perform a limited range of light work. (Tr. at 67-69) Following an assessment of vocational factors, it was opined that "[t]he evidence shows that [Claimant] has some limitations in the performance of certain work activities; however, these limitations would not prevent the individual from performing past relevant work as a/an truck driver" and that Claimant's RFC permitted him the perform his past relevant work as it is "actually performed." (Tr. at 71)

Medical Evidence During Claimant's Return to Employment,
October 2015-December 2016:

On November 6, 2015, Ms. Stover saw Claimant for a refill of his anxiety medication.  (Tr. at 385) He told Ms. Stover that he did not want to continue taking Lasix on a daily basis, and wanted to "go off" propranolol which had been prescribed for essential hypertension (Tr. at 363) because it kept his heart rate from going up with physical activity, which he did not like. (Tr. at 385) Ms. Stover prescribed medication for vitamin D deficiency, hyperlipidemia, other mixed anxiety disorders, and anxiety disorder. (Tr. at 385-386)

On January 29, 2016, Ms. Stover saw Claimant for a medication refill for anxiety. (Tr. at

417) Diagnoses included hyperlipidemia, vitamin D deficiency, and anxiety disorder, NOS. (Id.)

On April 22, 2016, Ms. Stover saw Claimant for medication refills and laboratory results. (Tr. at 422) He admitted that he did not fast on the day the labs were drawn. (Id.) Diagnoses included essential hypertension, and anxiety disorder NOS. (Tr. at 383) Ms. Stover prescribed Klonopin for anxiety. (Id.) Diagnoses included hyperlipidemia, vitamin D deficiency, anxiety disorder, NOS, and leukopenia (decrease in white blood cells). (Tr. at 422)

On July 15, 2016, Ms. Stover saw Claimant for medication refills; diagnoses included hyperlipidemia, vitamin D deficiency, and anxiety disorder, NOS. (Tr. at 435)

On October 7, 2016, Michael D. Walker, PA-C saw Claimant for anxiety and hypertension medication refills. (Tr. at 437) Diagnoses included hyperlipidemia, vitamin D deficiency, and anxiety disorder NOS. (Tr. at 437-438)

Medical Evidence After Claimant Discontinued Working:

On January 10, 2017, Joshua Matthew Hopkins, PA-C saw Claimant for anxiety and hypertension medication refills. (Tr. at 439) Diagnoses included hyperlipidemia, vitamin D deficiency, and anxiety disorder NOS. (Tr. at 439-440)

Claimant's Function Reports:

On August 7, 2014, Claimant completed a Function Report in connection with his application for benefits. (Tr. at 173-180) He indicated that he did not need special reminders to take care of his personal needs, grooming or reminders or help to take his medicine. (Tr. at 175) His hobbies included watching television and riding a motorcycle. (Tr. at 177) He rode a motorcycle once every two weeks (Tr. at 176) and has been riding for nearly 40 years. (Tr. at 177)

He stated that he is able to pay bills, handle a savings account, count change, and use a

checkbook/money orders. (Tr. at 176) He spent time with his wife and children, did not need to be reminded to go places and drove a car. (Tr. at 179) He stated that he could not be around a crowd or do well dealing with people. (Tr. at 180) He stated that he has panic attacks when he is around people and that he cannot sleep when he needs to and is nervous all the time. (Tr. at 173)

In another Function Report, dated March 17, 2015, Claimant stated that he watched television and listened to the radio. (Tr. at 196) He stated that he had no social activities. (Id.) Claimant stated that he cannot handle stress at all or changes in routine which leads to severe anxiety and panic attacks; he avoids public places and the only place he went was to his doctor (Tr. at 198), with his wife to accompany him. (Tr. at 196)

In his Disability Report – Appeal, submitted in February 2016, Claimant noted an increased difficulty with cleaning house, yard work, caring for animals, caring for children, shopping, attending social activities, driving, laundry, walking, and with personal care. (Tr. at 205)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he had worked for Penske Logistics as a truck driver from October 2015 to May 2016. (Tr. at 33, 35) He explained the company allowed him to drive as long as he only took one of the two anxiety medication pills he is prescribed, but he was also told that if he had an accident and testified positive for more than that amount, he would be sent to prison. (Tr. at 33) He stated that threat scared him into leaving the job, and then a month later in June 2016, returning to his previous employer, U.S. Express, where he was not permitted to take his medication at all. (Tr. at 33, 35) He was placed on medical suspension in December 2016 by U.S. Express when he divulged he was taking the medication again. (Tr. at 34) He stated not having his

medication was "extremely difficult" on him. (Tr. at 33) Additionally, Claimant explained that the sitting and bouncing in the truck was causing pain to his knees and back as well, and he was unable to drive if taking pain killers. (Tr. 34-35) He stated he occasionally drove for Uber on Saturday nights and worked for an online music publishing company. (Tr. at 36) He confirmed he made "way less than $1,000" per month at these jobs (Tr. at 37)

Claimant testified he had difficulty with his knees and breathing if carrying heavy items but could carry about 20-25 pounds. (Tr. at 37-38) He indicated he was prescribed Celexa for depression and that he is okay with it most of the time, but still experienced "bouts" of depression. (Tr. at 38) He stated anxiety was an everyday issue for him despite taking his medication, and he avoided crowds of people, stores, and restaurants, a problem he has had since he was 21. (Tr. at 38-39) Claimant admitted having difficulty with concentrating during his online job and stated he would need to take a break and play his guitar for release, which he considers very good therapy for him. (Tr. at 39)

For "years and years", Claimant stated he had left shoulder pain since falling from a rock cliff in junior high school. (Id.) He stated his left arm would sometimes dislocate, and he would push it back into place with his right arm, though it does not hurt. (Tr. at 40) He stated he had previously received steroid injections in his shoulder but had not had an injection for a long time. (Tr. at 40-41)

<u>Mary E. Buban, Psy.D., Medical Expert ("ME") Testimony:</u>

Dr. Buban testified there was not enough evidence in the administrative record to find Claimant's mental impairments would meet or equal a listing. (Tr. at 42) In evaluating the paragraph B criteria, Dr. Buban indicated she believed Claimant would have a mild limitation in

understanding, remembering, and applying information; a moderate limitation in interacting with others; a mild limitation in maintaining concentration, persistence, or pace; and no limitation for adapting or managing oneself. (Id.) She stated his limitations would include needing jobs that did not require interaction with the public and allowed for only infrequent contact with coworkers or supervisors. (Tr. at 42-43)

<u>Patricia B. Posey, Vocational Expert ("VE") Testimony:</u>

The VE classified Claimant's past relevant work as a truck driver (DOT #904.383.010) at the medium exertional level. (Tr. at 44) She confirmed that an individual limited to a light RFC would be unable to perform this job. (Id.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Past Relevant Work:

Claimant argues that the ALJ's step four finding that he remained capable of performing his past relevant work as a truck driver/owner operator is not supported by substantial evidence. SSR 82-61 provides for three possible tests for determining whether or not a claimant retains the capacity to perform his past relevant work:

1. Whether the claimant retains the capacity to perform a past relevant job based on a broad generic, occupational classification of that job, e.g., "delivery job," "packaging job,", etc.

2. Whether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it.

3. Whether claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy. (The Dictionary of Occupational Titles (DOT) descriptions can be relied upon—for jobs that are listed in the DOT—to define the job as it is usually performed in the national economy.) It is understood that some individual jobs may require somewhat more or less exertion than the DOT description.

See, SSR 82-61, 1982 WL 31387 at *1-2. It is further provided that "where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be 'not disabled.' " Id. at *2.

SSR 82-62 provides that

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:
>
> 1. A finding of fact as to the individual's RFC.
>
> 2. A finding of fact as to the physical and mental demands of the past job/occupation.
>
> 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

See, SSR 82-62, 1982 WL 31386, at *4.

The Ruling notes that "*[y]our impairment(s) must prevent you from doing your past relevant work* . . . *If you can still do this kind of work, we will find that you are not disabled.*" Id. at *1 (quoting 20 C.F.R. § 404.1520(f)) (*italics* in original). In addition, the Ruling provides that reasonable inferences may be drawn in determining the weight attributed to pertinent medical and nonmedical factors in determining whether a claimant can meet the physical and mental demands of his past relevant occupation. Id. at *4.

At the outset, the ALJ noted Claimant's "testified that he returned to work after the alleged onset date and worked full-time as a truck driver from October 2015 to May 2016 for Penske Trucking then from June 2016 to December 13, 2016 for U.S. Express (Trucking)." (Tr. at 17) The ALJ found that Claimant's "work activity involved significant physical and mental activities and generated earnings exceeding substantial gainful activity level amounts" during that period. (Id.) In addition, the ALJ acknowledged Claimant's testimony that "he continued to work" and was "currently performing UBER driving" as well as "publishing music online" although Claimant "attested that he earned 'way less' than $1,000.00 per month." (Id.)

There is no dispute that the vocational expert characterized Claimant's past relevant work at the medium exertional level. During the mental status examination with Ms. Smith in December

2014, Claimant reported that he last worked in May 2014 as "an over-the-road truck driver" and that his longest period of employment was working as an owner/operator for US Xpress Incorporated. (Tr. at 250) He "indicated that he was required to read and write for his past employment and operate an 18-wheeler truck" and that he maintains a valid West Virginia CDL driver's license. (Id.) There is no evidence in the record that when Claimant returned to his past relevant work as a truck driver for Penske Trucking and then for U.S. Express (Xpress) that he performed this job any differently from before or prior to May 2014.

In Cauthen v. Finch, the Fourth Circuit found that denial of disability benefits was proper when "[t]he evidence reveals that the [impairment] is one of long standing and that claimant has worked regularly for many years affected to virtually the same extent as at present." 426 F.2d 891, 892 (4th Cir. 1970) (per curiam).[3] Claimant testified that his mental impairments, including depression, anxiety and agoraphobia, which caused him "difficulty with crowds of people" have been a problem for him since he was 21 years old. (Tr. at 38-39) He testified that the problems with his left shoulder, which caused his arm to "pop out of place" have persisted since he was in junior high school after having fallen off a rock cliff. (Tr. at 39, 40) Claimant also testified that his back pain, caused by "bouncing around in your chair . . . for 20 years" as a truck driver "took its toll" and that he had "gained a lot of weight over the years." (Tr. at 34) Claimant specifically testified that he had to quit his job as a truck driver, an occupation he has held for several years, because he was not allowed to take his anti-anxiety medication. (Tr. at 33-34)

The ALJ noted all of these facts in the written decision, and further acknowledged that Claimant reported bone spurs in his back and the vibration of the truck aggravated his back pain;

---

[3] Cited in Craig v. Chater, 76 F.3d 585, 595 at n.7 (4th Cir. 1996).

that he can only lift 20 pounds; that he cannot drive a truck and take his anxiety medication; and importantly, that Claimant "attested that he had worked after the alleged onset date and he continued to work. (Tr. at 20-21) From this evidence, the ALJ determined Claimant's "activities and the objective medical evidence do not support total disability." (Tr. at 21) The Commissioner's observation is correct that the medical evidence simply does not demonstrate that Claimant's impairments became more severe after he discontinued working full time as a truck driver in December 2016.

> Of further interest here is that the ALJ noted that Claimant
>
> initially cited reasons other than disability for filing his application. On July 29, 2014, he completed an Adult Disability form and reported he had a combination of events that spiraled into him needing to quit work. He reported that his truck had broken down in Delaware and he had to come home for two weeks. He got the truck out of the shop and it broke down again. *He just stopped working*. His wife had assumed care of the children of her nieces and nephews. The claimant reported that there was "big pressure and stress" to take care of them as their parents would not care for their own children. His conditions were starting to get worse and made it more difficult for him to work.

(Tr. at 21, 168) (emphasis supplied)

The ALJ went on to observe that "[d]espite these allegations, the claimant pursued treatment only through his primary care source", Rachel Stover, CFNP. (Tr. at 21) It was further noted that although Ms. Stover diagnosed lumbago and prescribed Claimant Ultram for his low back pain and physical therapy, there was no indication in the record that Claimant participated in physical therapy. (Tr. at 21, 300) Also noted was that Ms. Stover made no other referrals for treatment. (Tr. at 21) The ALJ observed that although Claimant reported that he needed a shower chair prescribed and that "his lawyer told him to get one for Social Security" and that he cannot stand long enough to take a shower without one (Tr. at 21, 367), from April 2016 to June 2016

Claimant "did not mention back pain or any related problems" and that his back "was normal on physical examination." (Tr. at 21, 286-289) The ALJ noted further

> After that date, Ms. Stover removed the diagnosis of lumbago from her records and she no longer prescribed any pain medications for this condition. Moreover, the claimant's physical examinations repeatedly revealed no indication of lumbar spine abnormalities through January 2017 and his back was described as normal. (Tr. at 21-22, 363, 366, 367, 381, 385, 415, 422, 437-440) In consideration of the medical evidence and the claimant's statements regarding work after onset, it appears he is capable of at least medium exertional work. (Tr. at 22)

With regard to Claimant's mental impairments, the ALJ acknowledged that the record showed Claimant "pursued and received only conservative care for mental health symptoms." (Id.) The ALJ noted Dr. Buban's testimony summarizing the evidence of record, including Dr. Buban's recognition that Claimant's treatment consisted of only medication management "with no indication from [his treating] source of significant symptoms or limitations." (Tr. at 22, 289, 292, 328, 334, 366, 385, 415, 422-424, 438) Significantly, the ALJ noted Dr. Buban's observation that Claimant's "past work as a truck driver was a solitary type position and his general complaint was that he could not tolerate crowds" and that he "should be limited to jobs with no interaction with the public and infrequent contact with co-workers and supervisors." (Tr. at 22) Additionally, the ALJ found Dr. Buban's opinion "more persuasive" than the State agency non-examining psychological consultants' opinions, as she "had the opportunity to consider the subsequent evidence, including the claimant's testimony that he publishes music online and performs UBER driving, which supports he would not be markedly limited in social functioning." (Tr. at 23) The ALJ did note, however, that both State agency consultants opined that Claimant "retained the ability to perform a variety of routine work activities that entailed minimal contact with others." (Id.)

Given this evidence, it was reasonable for the ALJ to infer that Claimant retained the capacity to perform his past relevant work as a truck driver/operator owner, which is buttressed by the fact that he actually returned to the same job despite his longstanding physical and mental impairments.

To the extent that Claimant argues that the ALJ "***claimed to have based her step four finding and denial of benefits on vocational expert testimony, that testimony did not exist***", this argument is unavailing. (ECF No. 15 at 7, emphasis in original) The colloquy between the ALJ and the vocational expert at the hearing was indeed brief, and only addressed the classification of Claimant's past work and that an individual limited to light work could not perform his past work (Tr. at 44), as the vocational expert's past work summary report was provided to the ALJ sometime prior to the hearing, although it did not make it to the official file as an exhibit. (Tr. at 43) Though Claimant likens the ALJ's finding here akin to the reversible errors made by adjudicators in Koch v. Colvin[4] and Blankenship v. Colvin[5], the distinct difference between those cases and the one at bar is that Claimant actually returned to his prior work during the relevant period, whereas the other claimants did not return to their past relevant work since their application/onset dates.

In this case, the ALJ made several explicit findings of fact at step four: (1) that Claimant worked as a truck driver from 2004-2008, as a truck owner operator from 2008-2014, and that he testified that he drove a truck from October 2015 to December 2016 (Tr. at 23); (2) His earnings during those years were above substantial gainful activity levels (Id.); (3) The vocational expert

---

[4] No. 2:13-cv-06780, 2014 WL 2589590 (S.D.W. Va. June 10, 2014).
[5] No. 2:14-cv-27469, 2016 WL 1103891 (S.D.W. Va. Feb. 26, 2016).

identified this work (DOT 904.383-010)[6] as semi-skilled and medium, (Tr. at 24); and (4) "In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned agrees with the vocational expert and finds the claimant is able to perform his work a[s] truck driver/owner operator as actually and generally performed in the national economy." (Id.) The ALJ clearly relied on other evidence besides the vocational expert's identification of Claimant's past work, the most salient fact being that Claimant returned to his past relevant work after his alleged onset date.

In short, the undersigned **FINDS** the ALJ's step four finding that Claimant retained the capacity to perform his past relevant work is supported by the substantial evidence.

Failure to Consider Obesity as an Impairment Beyond Step Two:

Claimant contends that his obesity was not properly considered in compliance with SSR 02-1p, insofar as the ALJ provided no specific reason for finding his obesity a non-severe impairment; Claimant further asserts that the ALJ discredited Dr. Boukhemis's opinion which clearly considered Claimant's obesity, in combination with his other physical impairments, and

---

[6] The DOT, or Dictionary of Occupational Titles, provides information about how a job is generally performed in the national economy. Bostic v. Astrue, No. 2:09-cv-00623, 2010 WL 2710548, at *9 (S.D.W. Va. July 8, 2010). The description for the "tractor-trailer-truck driver" job pursuant to the DOT is as follows:

> Drives gasoline or diesel-powered tractor-trailer combination, usually long distances, to transport and deliver products, livestock, or materials in liquid, loose, or packaged form: Drives truck to destination, applying knowledge of commercial driving regulations and skill in maneuvering vehicle in difficult situations, such as narrow passageways. Inspects truck for defects before and after trips and submits report indicating truck condition. Maintains driver log according to I.C.C. regulations. May assist workers in loading and unloading truck. May transport new automobiles or trucks from manufacturers or rail terminals to dealers and be designated Transport Driver (motor trans.). May drive tractor with two trailers hitched in tandem and be designated Double-Bottom Driver (any industry). May drive tractor-trailer combination to deliver poles for utility and construction companies and be designated Pole-Truck Driver (construction; tel. & tel.; utilities). May work as member of two-person team driving tractor with sleeper bunk behind cab and be designated Long-Haul-Sleeper Driver (any industry). May drive tractor-trailer combination to deliver or spray water and be designated Water-Truck Driver (construction; petrol. & gas)

See DICOT 904.383-010 (G.P.O.), 1991 WL 687703.

deemed him limited to the light exertion level with additional postural limitations. (ECF No. 15 at 10) As noted by Claimant in his brief, at the second step of the sequential evaluation process, the ALJ determined that in addition to "[a]ll other allegations of impairment[7] found in the record, including but not limited to . . . obesity (with body mass index (BMI) of 41.1[8] (Exhibit 4F/91) . . ." (Tr. at 18, 367) that these impairments

> are non-severe and/or not medically determinable as they are responsive to treatment, cause no more than minimally vocationally relevant limitations, did not last or are not expected to last at a "severe" level for a continuous period of 12 months or expected to result in death, or are not properly diagnosed by an acceptable medical source and/or pursuant to regulatory requirements.

(Tr. at 18) Claimant states that the ALJ's failure to specify reasons for finding Claimant's obesity a non-severe impairment is a failure to "meaningfully discuss"[9] this impairment at step two and at any subsequent step, and also fails to analyze this impairment in accordance with SSR 02-1p. (ECF No. 15 at 10-11)

SSR 02-1p provides that obesity will be deemed a severe impairment, alone or in combination with another medically determinable physical or mental impairment(s) when it "significantly limits an individual's physical or mental ability to do basic work activities." 2002 WL 3468281, at *4. As with the Regulations, SSR 02-1p further provides that an impairment will be considered " 'not severe' only if it is a slight abnormality (or a combination of slight

---

[7] The ALJ also referenced hyperlipidemia, vitamin D deficiency, scoliosis, left shoulder strain, reported dyspnea with negative chest x-ray, edema, ankle swelling, knee pain with normal x-rays, no varicosity changes, and normal gait and musculoskeletal examination. (Tr. at 18)

[8] It is noted that pursuant to SSR 02-1p, BMIs greater than or equal to 40 is considered by the Clinical Guidelines as "Level III" or "extreme" obesity. SSR 02-1p, 2002 WL 3486281, at *2. Of interest here is the three levels of obesity "describe the extent of obesity, but they do not correlate with any specific degree of functional loss." Id.

[9] Claimant compares the ALJ's error herein to the reversible error discussed in Winston v. Astrue, 2012 WL 4086448, at *4 (E.D.N.C. Sept. 17, 2012) where the court found remand was appropriate because the adjudicator failed to discuss the claimant's obesity in the decision.

abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities[.]" Id. Additionally, the Ruling states:

> There is no specific level of weight or BMI that equates with a "severe" or a "not severe" impairment. Neither do descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes. Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.
> Id.

> However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

> Id. at *6.

There is no dispute regarding Claimant's obesity. The only other reference beyond the step two determination that his obesity was a "non-severe" impairment is where the ALJ reviews Dr. Boukhemis's opinion:

> On April 8, 2015, Rabah Boukhemis, M.D., a State agency consultant and non-examining source, considered the evidence and opined the claimant would be limited to the light exertional level of work, lifting and carrying 20 pounds occasionally, 10 pounds frequently; standing and walking 6 hours of an 8-hour workday; and sitting 6 hours of an 8-hour workday; with additional postural and environmental limitations. He assessed these limitations secondary to degenerative disc disease, arthralgias of the bilateral knees, and obesity; yet he only found degenerative disc disease severe (Exhibit 3A). (Tr. at 23, 60-74) The undersigned affords some weight to this opinion; however, the record as a whole does not support limiting the claimant to light exertional work. The claimant worked full-time after the alleged onset date performing work at the medium exertional level for more than a year (Testimony). In treatment notes, he has received conservative care and he even returned his pain medications to his treating source in June 2015 (Exhibit 4F/87). (Tr. at 23, 363) The claimant has some findings of degenerative changes in the spine with minimal scoliosis but no degree of curvature given. The record reflects some acute findings on physical examination of shoulder strain and ankle swelling but not objective evidence that would limit the claimant to light work (Exhibits 1F/3; 3F/15; and 4F/31, 33, 53, 74, 92, 100, 101, 102).

29

(Tr. at 23, 242, 270, 307, 309, 329, 350, 368, 376, 377, 378) Claimant takes issue that the ALJ did not address his obesity any further than what has been discussed *supra*, and compares this ostensible omission to the reversible error found in the <u>Winston</u> case; however, there are some stark differences between that case and the one at bar.

Perhaps the most important difference is that the <u>Winston</u> claimant did not return to her prior relevant work (or any other work at substantial gainful activity levels) after the alleged onset date. <u>Winston</u>, 2012 WL 4086448, at *1 (E.D.N.C. Sept. 17, 2012).

Another difference is that the adjudicator in <u>Winston</u> did not appear to rely upon any particular medical records concerning the claimant's obesity. <u>Id</u>. at *4. In this case, the ALJ clearly relied upon Dr. Bouhkemis's opinion noting Claimant's limitations due to degenerative disc disease, arthralgias of both knees as well as obesity, but that the degenerative disc disease was found to be the only severe physical impairment. The <u>Winston</u> court noted that an adjudicator's failure to specifically consider a claimant's obesity "may be unnecessary" when the ALJ relies on medical records that adequately show a claimant's obesity and adopts the conclusions of doctors who are aware of the claimant's obesity. <u>Id</u>. (citations omitted) Finally, the <u>Winston</u> adjudicator was found to not have considered the claimant's obesity at any step of the sequential analysis. <u>Id</u>.

The record of evidence concerning Claimant's obesity, alone or in combination with other impairments, did not demonstrate functional limitations. Although SSR 02-1p provides that obesity can aggravate certain impairments, such as depression and lumbago,[10] two impairments the ALJ herein found severe, the fact remains that Claimant returned to his past relevant work at

---

[10] SSR 02-1p, 2002 WL 3486281, at *3.

full-time for over a year after the alleged onset date which simply does not show that his obesity, or any other impairment, severe or not, impaired his ability to work since he alleged disability. In sum, the ALJ's consideration of Claimant's obesity does not run afoul with SSR 02-1p, particularly when the most significant evidence of record is that Claimant returned to his past relevant work at substantial gainful activity level since the alleged onset date, further demonstrating any functional deficits or impairments due to his obesity did not compromise his ability to work. Accordingly, the undersigned **FINDS** Claimant's argument that the ALJ failed to "meaningfully discuss" his obesity lacks merit.

With regard to the ALJ's evaluation of the opinion evidence from Dr. Boukhemis, it is notable that Dr. Boukhemis rendered his opinion ***prior*** to Claimant's return to his past relevant work. It is also notable that Dr. Boukhemis found that the medical record at the time supported his assessment that Claimant should be limited to the light exertional level with additional postural limitations, however, Claimant was capable of performing his past relevant work at the medium exertional level for over a year ***after*** Dr. Boukhemis issued his medical opinion. The significance of that evidence cannot be ignored.

20 C.F.R. § 404.1527(a)(2) governs the SSA's evaluation of opinion evidence:

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment

relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. Id. § 404.1527(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. § 404.1527(d)(3).

As noted *supra*, the ALJ considered Dr. Boukhemis's opinion that Claimant's impairments limited him to light work, but she also acknowledged that Claimant worked full-time after the alleged onset date performing work at the medium exertional level for over a year. The ALJ also compared Dr. Boukhemis's opinion with the other medical evidence of record. In finding that the evidence of record does not support Dr. Boukhemis's opinion that Claimant is limited to light work, the ALJ assigning "some weight" does not offend the Regulations given the circumstances in this case. Accordingly, the undersigned **FINDS** the ALJ's evaluation of Dr. Boukhemis's medical opinion is supported by substantial evidence.

Claimant's RFC Assessment:

Claimant's last point of contention pertains to the ALJ's RFC assessment, specifically that the ALJ discredited Dr. Boukhemis's opinion in contravention to the Regulations as well as SSR 96-8p because she did not specify the medical evidence that conflicted with that opinion or address whether Claimant could perform the requirements of medium work without any additional postural or environmental limitations. (ECF No. 15 at 13-14) Claimant also suggests that the ALJ discredited Dr. Boukhemis's opinion due to Claimant's "two unsuccessful attempts to work in

2015 and 2016" but failed to consider Claimant's description of his working conditions and the effects of his unsuccessful work attempts on his wellbeing. (Id. at 14)

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As an initial matter, Claimant's characterization that this work as "two unsuccessful attempts to work in 2015 and 2016" (ECF No. 15 at 14) is unsupported by the record: Claimant testified that he worked from October 2015 to May 2016 for Penske Trucking and then from June 2016 through December 13, 2016 and that he took time off, "a month" between the two jobs. (Tr. at 35) During this period, Claimant's earnings were above substantial gainful activity level. The Regulation[11] titled "unsuccessful work attempt" states:

> (1) General. Ordinarily, work you have done will not show that you are able to do substantial gainful activity if, after working for a period of 6 months or less, your impairment forced you to stop working or to reduce the amount of work you do so

---

[11] This Regulation has since been modified and no longer includes a paragraph (c)(5), however, the prior version of this Regulation applied at the time Claimant filed his application for benefits, and the pertinent paragraphs have not changed substantively.

that your earnings from such work fall below the substantial gainful activity
earnings level in paragraph (b)(2) of this section, and you meet the conditions
described in paragraphs (c)(2), (3), (4), and (5), of this section.

20 C.F.R. § 404.1574(c). Paragraph (c)(2), titled "Event that must precede an unsuccessful work
attempt," states that "[t]here must be a significant break in the continuity of your work before we
will consider that you began a work attempt that later proved unsuccessful. You must have stopped
working or reduced your work and earnings below the substantial gainful activity earnings level
because of your impairment or because of the removal of special conditions that were essential to
the further performance of your work." Id. § 404.1574(c)(2). It is clear from the plain language of
this Regulation that Claimant's work activity does not qualify for consideration as an
"unsuccessful work attempt." The Regulation requires that Claimant had to have stopped working
within six months after attempting the work. Claimant worked for more than six months at
substantial gainful activity earnings level prior to leaving Penske to return to work for U.S.
Express. Paragraph (c)(5) expressly states that "[w]e will not consider work you performed at the
substantial gainful activity earnings level for more than 6 months to be an unsuccessful work
attempt regardless of why it ended or was reduced below the substantial gainful activity earnings
level." Id. § 404.1574(c)(5).

Claimant has made no showing that he returned to work for Penske as a truck driver and
then was required to stop within six months after he began before returning to work as a truck
driver for U.S. Express, when during this period he performed at substantial gainful activity
earnings level. Therefore, the Regulations regarding "unsuccessful work attempt" have no bearing
on this case and Claimant's argument to that extent lacks merit. See also, Varney v. Barnhart, 325
F.Supp.2d 709, 715 (S.D.W. Va. June 23, 2003).

As discussed *supra*, the ALJ examined the opinion evidence provided by Dr. Boukhemis and explicitly noted that since the doctor issued his April 2015 assessment limiting Claimant to light exertional work, Claimant returned to his medium level work and performed such work for over a year. Contrary to Claimant's assertion that the ALJ did not cite any specific medical evidence that conflicted with Dr. Boukhemis's opinion, the ALJ explicitly noted that treatment records showed that Claimant received conservative care and that he returned his pain medications back to his treating source in June 2015, which again, occurred after Dr. Boukhemis rendered his opinion. (Tr. at 23, 363) The ALJ also noted that though there were findings of degenerative changes in Claimant's spine with minimal scoliosis, there was "no degree of curvature given." (Tr. at 23) The ALJ noted findings concerning shoulder strain as well as ankle swelling, but again found that the objective evidence did not show Claimant was limited to light work – the most important piece of evidence noted by the ALJ being that Claimant "worked full-time after the alleged onset date performing work at the medium exertional level for more than a year." (Id.) That Claimant could perform the requirements of medium work with no additional postural or environmental limitations was demonstrated by Claimant himself, and clearly was the most important piece of evidence resulting in the ALJ's decision.

Though "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)), it is necessary that an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ's finding that Claimant worked at his past relevant work, at medium

exertional level without any additional postural or environmental limitations, and further acknowledging that the medical evidence of record did not show any deterioration of Claimant's conditions during or after Claimant returned to work as a truck driver, provided the necessary explanation that allows for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637.

In sum, the undersigned **FINDS** that the ALJ's RFC assessment is unsupported by substantial evidence. The undersigned further **FINDS** that the ALJ's determination that Claimant was not under a disability since May 31, 2014 is supported by substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (ECF No. 15), **GRANT** the Defendant's request to affirm the decision below (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which

objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 16, 2018.

Omar J. Aboulhosn
United States Magistrate Judge